UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JOHN DOE,                                                               :

                                                                                     :   Civil Action No:  7:19-cv-09601 (NSR) (JM)

                    Plaintiff,            :

                                                    :

                -against-            :

                                                    :

VASSAR COLLEGE,                                   :

                                                    :

                   Defendant.           :
------------------------------------------------------------------------X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF JOHN DOE'S ORDER TO SHOW CAUSE FOR A
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

GAGE SPENCER & FLEMING LLP
410 Park Avenue, Suite 810
New York, New York 10022
Tel. (212) 768-4900
*Attorneys for Plaintiff John Doe*

**TABLE OF CONTENTS**

Page(s)

TABLE OF CONTENTS……………………………………………………………………………..i

TABLE OF AUTHORITIES……………………………………………………………………….ii

Preliminary Statement …………………………………………………………………...............1

Argument…………………………………………………………………………………………..1

    I.    Plaintiff Will Suffer Irreparable Harm……………… …………………………………...1

    II.    Plaintiff Is Likely To Succeed On The Merits ……………………………………………4

        A.  The Unreliability Of The Adjudicator's Credibility Determination…..………..……………...5

        B.  Evidence Of Jane Doe's Consent……………………………………………………….7

        C.  Vassar Amply Demonstrated Its Gender Bias……………..…………………………….8

    III.    The Balance Of Equities Tips Decidedly In Plaintiff's Favor……………..………………………..11

    IV.    Conclusion…...……………………………………………………………………………13

## TABLE OF AUTHORITIES

**Cases:**                                                                                                              **Pages:**

*Bachman v. Harrington*, 184 N.Y. 458 (1906)……………………………………………………………..12

*Bhandari v. Tr. of Columbia Univ. in N.Y.*, 00 Civ. 1735 (JGK), 2000 U.S. Dist. LEXIS 3720 (S.D.N.Y. Mar. 27, 2000)……………………………………………………………………………………………….....2

Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016)……………………………………………….8

*Doe v. Cummins*, 662 Fed. Appx. 437 (6th Cir. 2016)……………………………………………….3, 9

*Doe v. Miami Univ.*, 247 F. Supp. 3d 875 (S.D. Ohio 2017)……………………….........................9

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018)……………………………………………………..9

*Doe v. Middlebury Coll.*, No. 1:15-cv-192-jgm, 2015 U.S. Dist. LEXIS 124540
(D. Vt. Sept. 16, 2015)……………………………………………………………………………2, 3, 4, 11

*Doe v. Pennsylvania State Univ.*, 276 F. Supp. 3d 300 (M.D. Pa. 2017)…………………………………..2

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019)……………………………………………………….3

*Doe v. Univ. of Notre Dame*, No. 3:17-CV-298-PPS/MGG, 2017 U.S. Dist. LEXIS 69645 (N.D. Ind. May 8, 2017)……………………………………………………………………………………………………….3

*Flint v. Dennison,* 488 F.3d 816 (9th Cir. 2007)………………………………………………………….3

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996)……………………………………………………...12

*LaRouche v. Kezer*, 20 F.3d 68 (2d Cir. 1994)……………………………………………………...12

*Montague v. Yale Univ.*, No. 3:16-cv-00885(AVC), 2017 U.S. Dist. LEXIS 216093 (D. Ct. 2017)…………2

*Nokes v. Miami Univ.*, Case No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (S.D. Ohio, Aug. 25, 2017)…2

*Ottaviano v. Kings Park Cent. Sch. Dist.*, 10-CV-4962 (ADS) (AKT), 2010 U.S. Dist. LEXIS 136055 (E.D.N.Y. Dec 23, 2010)……………………………………………………………………………….2

*Pederson v. La. State Univ.*, 213 F.3d 858 (5th Cir. 2000)……………………………………………10

*Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386 (W.D.N.Y. 2017)………………………………10

*Second on Second Café v. Hing Sing Trading*, 66 A.D.3d 255 (N.Y. App. Div. 1st Dep't 2009)……………12

*Shepard v. Irving*, 77 F. App'x 615 (4th Cir. 2003)……………………………………………………….3

*Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995)……………………..12

*XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp.2d 263 (S.D.N.Y. 2012)……………………12

Yu v. Vassar, 97 F. Supp. 3d 448 (S.D.N.Y. 2015)…………………………………………………………..4

Plaintiff John Doe ("Plaintiff"), by and through his attorneys Gage Spencer & Fleming LLP, respectfully submit this reply memorandum of law in further support of his order to show cause for a preliminary injunction enjoining Defendant Vassar College ("Defendant" or "Vassar") from implementing the sanction of suspension levied against Plaintiff, a student of the school. For the reasons which follow, the motion should be granted.

## Preliminary Statement

Since Vassar's execution of his suspension, Plaintiff has lost irreplaceable experiences, including weeks of classes, his Senior soccer season, his Captainship, his Senior Day experiences, and, quite possibly, the last of his NCAA soccer eligibility. These unique aspects of his college years are now gone. Now, Plaintiff approaches a permanent loss of a graver nature: the loss of the semester. If lost, Plaintiff will have suffered a permanent interruption of his four years, a fact which courts recognize will subject him detrimentally and forever to questions from employers, schools, licensing bodies, and the like, about the reasons for time taken away from his course of study.[1]

Plaintiff merely seeks to preserve the status quo ante pending the resolution on the merits of the case's serious underlying issues. This will spare him a lost semester and all the negative repercussions it carries. But there will not be enough time to prevent this harm unless an injunction issues immediately. If equitable relief is not granted, Plaintiff will suffer irreparable harm that even ultimate victory on the merits cannot cure.

## Argument

### I.     Plaintiff Will Suffer Irreparable Harm

Defendant contends that suspension of a student's studies and prevention from graduating on time with his class do not constitute irreparable harm as a matter of law. *See* Defendant Vassar

---

[1] Plaintiff will also lose his "correlate" in writing which he was pursuing in the current semester but which is not available in the Spring, and, to graduate on time, would have to defy the advice given by the economics faculty and take four economics classes in one semester to satisfy his major requirement and complete his educational goals. While these realities might force him to not to graduate with his class and take another semester to complete his studies, this would require that he forego the chance to play professional soccer for a team in the United Kingdom next Fall. He cannot do both.

College's Memorandum of Law in Opposition to Plaintiff's Motion (Dkt. No. 8) ("Def. Mem.") at 10-12.  Its argument, however, overlooks decisional law in this circuit which holds to the contrary, that a sanction of suspension does constitute irreparable harm.  *See, e.g., Doe v. Middlebury Coll.*, No. 1:15-cv-192-jgm, 2015 U.S. Dist. LEXIS 124540, at *9 (D. Vt. Sept. 16, 2015)(holding that suspension from school is an irreparable harm because nothing can "compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career . . . "); *Bhandari v. Tr. of Columbia Univ. in N.Y.*, 00 Civ. 1735 (JGK), 2000 U.S. Dist. LEXIS 3720, at *15-16 (S.D.N.Y. Mar. 27, 2000)("[w]hile nothing would prevent the plaintiff from repeating the courses he is currently taking after serving his suspension, requiring him to do so would forever deny him the benefit of the work he has already performed this semester and would necessarily delay his ultimate fulfillment of the requirements for a degree. This constitutes irreparable injury"); *Doe v. Pennsylvania State Univ.*, 276 F. Supp. 3d 300, 314 (M.D. Pa. 2017) (holding suspension to be an irreparable harm) (citing *Doe v. Middlebury*).  Similarly, courts have held that forced absence from school is irreparable harm, even where, unlike here, declared opportunity losses are speculative.  *Ottaviano v. Kings Park Cent. Sch. Dist.*, 10-CV-4962 (ADS) (AKT), 2010 U.S. Dist. LEXIS 136055, at *14-19 (E.D.N.Y. Dec 23, 2010) (ruling a high school senior's suspension from school was an irreparable harm, even though she did not provide evidence of any colleges that offered her a scholarship and could not establish being offered any money); *see also Nokes v. Miami University*, Case No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 at *40, n.11 (S.D. Ohio, Aug. 25, 2017) (finding irreparable harm and rejecting as unpersuasive a university's argument that individuals' personal embarrassment, humiliation, and damage from being associated with sexual misconduct was not irreparable while businesses, *including universities*, benefit from a presumption of irreparable harm from damage to business reputation and goodwill in trademark cases).

    Defendant's contrary argument relies principally on *Montague v. Yale Univ.*, No. 3:16-cv-00885(AVC), 2017 U.S. Dist. LEXIS 216093 (D. Ct. 2017), which is inapposite to the instant case.  Unlike here, the plaintiff in *Montague* did not have any job or promised job opportunity set at the time of his

2

expulsion. He merely argued he could more easily get a good job with a Yale degree than without one. Here, as set forth in Plaintiff's Verified Complaint, Plaintiff actually has an invitation to join a professional soccer team in the Fall of 2020. The offer is likely not open past Fall 2020. If he does not take up the offer then, it will most decidedly be lost. His suspension by Vassar would, therefore, jeopardize his chosen career path should he finish his education.

In any event, Defendant avoids the more important point that suspension marks Plaintiff with a gap in his studies which will be forever subject to explanation. The *Middlebury* court articulated the problem: whether Plaintiff is ultimately successful in this litigation or not "[p]laintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap" whenever someone so much as looks at his resume). *See Doe v. Middlebury*, 2015 U.S. Dist. LEXIS 124540 at *9; *Doe v. Univ. of Notre Dame*, No. 3:17-CV-298-PPS/MGG, 2017 U.S. Dist. LEXIS 69645, at *40 (N.D. Ind. May 8, 2017) ("I am persuaded that this gap constitutes irreparable harm to John's reputation and resumé for purposes of career prospects and possible further academic advancement. The questions the gap raises, and the explanation it requires, are potentially damaging to John in a manner not compensable by money damages *and not repaired by permanent injunctive relief that might be granted after a decision on the merits in John's favor*") (emphasis added).[2]

For this reason, Defendant's argument is misplaced that Plaintiff's suspension will cause him no harm due to the supposed fact that the Family Educational Rights and Privacy Act (FERPA) mandates that it cannot disclose the record of Plaintiff's discipline to a graduate school or a potential employer without his consent. *See* Def. Mem. at 25. Whether or not *Defendant* is foreclosed from making

---

[2] Were he to prevail on the merits of his claims, Plaintiff would be entitled to a permanent injunction expunging the finding of responsibility for sexual misconduct and harassment on the ground that his marred record is a continuing harm to him. *See Doe v. Purdue University*, 928 F.3d 652, 666 (7th Cir. 2019) (citing *Flint v. Dennison,* 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records "serve[s] the purpose of preventing present and future harm"); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to "remove the negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (an "F" grade and a plagiarism conviction "constitute[d] a continuing injury to the plaintiff" and an action to remove them was "prospective in nature")). But, he seeks a preliminary injunction here to protect against the harm that a permanent injunction cannot remedy, i.e., the compelled gap in his education from his suspension which he will be required to address prospectively with educational institutions, employers, licensing bodies, and the like.

such disclosures, the reality, identified by the court in *Middlebury*, is that *Plaintiff* will be forever tarred with being asked and, as a practical matter, having to answer the direct question of why he experienced the interruption in his education. For but one example, should Plaintiff ever wish to go to law school, applications routinely ask whether one's college education was interrupted for one term or more and the circumstances of the interruption. *See, e.g.*, https://www.fordham.edu/download/downloads/id/13538/2019-2020_jd_application_form.pdf, at 12-13. Contrary to Defendant's argument that no irreparable harm exists, Plaintiff will incur a permanent, life-long, and irremediable harm once he loses this current semester in only a few short weeks. Once that becomes final, it cannot be undone to prevent these sorts of inquiries into the circumstances, even were he to prevail on the merits ultimately. The preliminary relief sought merely seeks to preserve the status quo ante and protect Plaintiff, at little to no cost to Defendant, from this easily avoidable, yet permanent, harm.

## II.     Plaintiff Is Likely To Succeed On The Merits

Defendant further opposes Plaintiff's motion by advocating that the Court defer to its credibility determinations. As it knows, though, under the applicable standard for Title IX cases, the demonstration of a flawed process and gender discrimination precisely entitles courts to "second-guess the panelists' credibility determinations and factual conclusions." *Yu v. Vassar*, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015). Defendant's suggested standard of deference, based on New York state court decisions addressing matters other than federal Title IX questions, thus is not applicable here.

Here, the process was flawed and gender biased. Vassar does not address the indisputable fact that the underlying decisions and its sanction of suspension were based on (i) a credibility determination expressly reliant on testimony which the sole witness subsequently recanted, and (ii) simply ignoring undisputed evidence which supplied proof of the very consent which Defendant determined was altogether lacking from the sexual encounter in question. Along with Defendant's consistently

demonstrated gender bias, these facts establish Plaintiff's likelihood of success on the merits of the instant dispute.

### A. The Unreliability of the Adjudicator's Credibility Determination

The instant case hinged on a credibility determination. Defendant's Adjudicator credited Jane Doe's version of events, and rejected Plaintiff's conflicting version. Then, on his internal appeal of the Adjudicator's decision, Plaintiff presented to Vassar the fact, supported by documentary evidence, that the hearing's sole witness JK, on whose testimony the Adjudicator expressly placed great emphasis in reaching her conclusions, disavowed his own testimony and implied that it had been manipulated by Jane Doe. *See* Declaration of William B. Fleming dated October 17, 2019 ("Fleming Aff."), Exs. 3-4 (describing Jane Doe as "manipulative" and "toxic" in achieving "what she wants"). At a minimum, the alleged manipulation calls into serious question both (i) her credibility, and (ii) the Adjudicator's faulty reasoning that Jane Doe's previous sexual relationship with JK, mere weeks prior to the event with Plaintiff, presented no conflict of interest or proved "there was no reason for [Jane Doe] to lie about or exaggerate the facts [about the event with Plaintiff] to [JK]." Fleming Aff., Ex. 1 at 7. Furthermore, when given a chance on Plaintiff's appeal to rectify the damage caused by the false testimony (which had been expressly credited as important to the Adjudicator's decision), Defendant simply ignored it, electing instead not to address the issue at all. Indeed, Defendant's opposition memorandum is conspicuous for its continuing silence on the issue.

There were also other reasons not to credit to Jane Doe's version of events. The Adjudicator cited Jane Doe's after-the-fact text and emailed messages as contemporaneously made and, thus, corroborative of her claims. Yet, some were provably false. For example, Jane Doe claimed that Plaintiff had taken his clothes off in front of her and gone to take a shower. *See* Affirmation of Monica C. Barrett, Esq. dated October 28, 2019 (Dkt. No. 8-1) ("Barrett Aff."), Ex. 2 at 3. Jane Doe's own witness JK, however, included in his belated, post-hearing observations that, upon further thought, he recalled meeting

Plaintiff, in the hallway, returning from the shower holding his clothes – persuasive proof that he had not taken his clothes off in front of Jane Doe in his room as claimed, but rather in the shower.

Additionally, in one of those post-event text messages, Jane Doe herself admitted that she was writing them in the hopes that the process of doing so would trigger some memory of what had, in fact, happened that night.  *See, e.g.*, Barrett Aff., Ex. 2(G) at 48 of 62.  Far from being corroborative of her claims, such an admission corroborates that Jane Doe had no reliable sense of what had happened between her and Plaintiff.[3]

Further reasons undermining the credibility of Jane Doe's recollections and accusations lay in her changing story.  In her original complaint to the Title IX office, she alleged Plaintiff had engaged her in "unwanted oral copulation" (Def. Mem. at 4), a serious allegation based, presumably, on a strong memory but which was never raised again throughout the course of the process.  It also stood in stark and telling contrast with the established fact that neither person's clothes were removed during the sexual encounter at issue.

Further to the issue of credibility, as well as a flawed process, an issue arose in the hearing that Jane Doe had given written notice of JK's testimony after the deadline had passed in violation

---

[3]   While the Adjudicator acknowledged that Jane Doe was intoxicated to a high degree and had fuzzy recall of details, she credited Jane Doe's recollection of "certain facts of the night due to the impact they had on her."  Fleming Aff., Ex. 1 at 5.  Then, without citation to any authority, the Adjudicator concluded that "[t]his type of recall is not uncommon even in instances of intoxication where the brain recalls certain facts more vividly than others."  *Id*.  Contrary to the Adjudicator's unsupported conclusion, the science on the matter shows that it is not more likely an intoxicated person will remember traumatic events as opposed to normal ones, and warns that the memories could be "false" ones, artificially created after the person has sobered up. See Charles F. Zorumski, *Will Heavy Drinking Really Cause Forgetfulness?*, ScientificAmerican.com, Mar. 1, 2015, https://www.scientificamerican.com/article/will-heavy-drinking-really-cause-forgetfulness/, ("It is indeed possible for a person to get intoxicated and not remember what he or she did"); Chris Elkins, *What Are Alcohol Blackouts?*, Drugrehab.com, May 31, 2018, https://www.drugrehab.com/addiction/alcohol/blackouts/, ("You still process information. You're not anesthetized. You haven't passed out. But you're not forming new memories"); John Eligon, Maybe Just Drunk Enough to Remember, New York Times.com, Apr. 23, 2011, https://www.nytimes.com/2011/04/24/weekinreview/24eligon.html, ("In other words, it's not true that after a drunken night we tend to recall the exceptional over the mundane"); Cari Nierenberg, *Post-booze Blackout, How People Fill in the Blanks*, nbcnews.com, Dec. 26, 2011, https://www.nbcnews.com/healthmain/post-booze-blackout-how-people-fill-blanks-1C6437126, ("Researchers found that people frequently turn to unreliable sources to piece together these forgotten memories. . . . Roughly three-quarters of the study participants admitted they might have unintentionally made up information when a friend passed out, such as claiming the person had sex with a stranger or puked on someone. And nearly 17% of blackout sufferers later discovered they were misled by incorrect information, often coming from friends").  Jane Doe's troubling admission that her "contemporaneous" messages were written in an effort to discover what had happened echoes that science on intoxication, as well as the science that people are likely to develop false memories from others as a result of trying to piece together gaps in their memory, after the fact.

of Vassar's written procedures.  In response, Jane Doe claimed that she had given oral notice to the Title IX Coordinator prior to the deadline.  Barrett Aff., Ex. 11.  However, when questioned, the Title IX Coordinator admitted to Plaintiff and Plaintiff's father that she had "no recollection" of Jane Doe ever having done so.  *See* Affidavit of John Doe sworn to November 1, 2019 ("Doe Aff."), ¶ 7.

For all these reasons, Jane Doe's story which was credited by the Adjudicator included undeniable untruths which, incidentally, the denial of direct cross-examination or outside legal representation might have exposed in a timely fashion.

### B.  Evidence of Jane Doe's Consent

While Defendant credited Jane Doe's claims in all material respects, it rejected all facts and evidence, even in Jane Doe's version of the facts, which supported Plaintiff's defense that consent was given.  Notwithstanding the holes in her credibility discussed above, the Adjudicator flatly concluded that Jane Doe did not provide consent and that "there is no proof" of her having given consent.  Yet, Jane Doe admitted that, while in Plaintiff's room during the encounter in question, she kissed him back and responded sexually before stopping her responsiveness.  Fleming Aff., Ex. 1 at 3-4.  Defendant's policy defines consent as "given by words or actions creat[ing] clear permission regarding willingness to engage in sexual activity" and excludes "silence or lack of resistance."  *See* Barrett Aff., Ex. 5, Part F, Section IV at 36.  Active participation in kissing Plaintiff and otherwise "responding" is obviously neither silence nor lack of resistance.  It is active engagement.  Jane Doe's admitted responsiveness in Plaintiff's room is consistent with and corroborative of Plaintiff's testimony, rejected by the Adjudicator, that Jane Doe touched him back, including touching his genitals.  Under Vassar's own policy, this is proof of consent.

To the extent the question is whether Jane Doe's apparent intoxication nullified her ability to give consent, it bears strongest emphasis that, by the Adjudicator's own finding, the appearance of her intoxication progressed over time that night.  Fleming Aff., Ex. 1 at 5 ("I have looked at the photographs provided as Exhibits F (at 11:27 p.m.) and G (taken at 2:50 a.m.) and based on these photographs it appears that as the night went on [Jane Doe] appeared to be more intoxicated as the night progressed").

7

Indeed, the Adjudicator found that, upon the cessation of Jane Doe's responsiveness during the sexual encounter, Plaintiff stopped the encounter immediately ("a few moments" later) and withdrew from all sexual contact. *Id*., Ex. 1 at 4. From a policy compliance perspective, this is optimal, not egregious, behavior.

The Adjudicator failed to recognize any of the nuances these undisputed facts created. She instead concluded flatly that there was no proof of consent, but that if consent was given, Plaintiff's withdrawal due to his perception that Jane Doe had become unresponsive was proof that she was incapable of giving consent. It is on this heads-I-win, tails-you-lose basis that Plaintiff is poised to suffer the indelible mark of sexual misconduct and loss of his studies.

### C. Vassar Amply Demonstrated Its Gender Bias

Defendant's response to all of this is to say that, even if all true as Plaintiff argues, it does not exhibit the necessary gender bias. Citing to *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), Defendant pushes the notion that Plaintiff's argument simply recycles the rejected idea that evidence of public pressure constitutes proof of gender bias. To the contrary, courts have found gender bias where the evidence shows public pressure-plus, i.e., in cases where public pressure is coupled with other indicators of bias.

Here, Defendant's gender bias included more than just the School's wholesale change of both personnel and approach to such cases instituted in reaction to the activism following the 2014 case. *See* Fleming Aff., Exs. 8-12. It conducted the investigation entirely by females and, at the hearing too, Plaintiff was the only male present. Fleming Aff., Ex. 1 at 1-2. For the Adjudicator, the School hired a private lawyer whose pedigree notably includes associations with "The Professional Women's Business Network," "ABA Women Rainmakers," "The Women Advocate: ABA Section of Litigation," "Women's White Collar Defense Association," "Benchmark Women in Litigation Forum," as well as leading her firm's

diversity program to help underrepresented minorities (including women) attain judicial clerkships.[4] While obviously laudable in nearly all contexts, those associations fairly yield an inference of awareness and advocacy for women, women's groups, and women's issues. They do not reflect an appearance of disinterest regarding issues of gender. In this circumstance, the Adjudicator's crediting of each of Jane Doe's arguments – including those addressed above where the Adjudicator's finding contradicted the undisputed record evidence – and rejecting of Plaintiff's arguments – most indefensibly, by concluding that there was no proof at all on the question of consent – raise serious questions about gender bias. *See Doe v. Miami Univ.*, 247 F. Supp. 3d 875,, 886 (S.D. Ohio 2017) ("[c]ausation sufficient to state a Title IX discrimination claim can be shown via 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender'") (quoting *Doe v. Cummins*, 662 Fed. Appx. 437, 452 (6th Cir. 2016).

Furthermore, the Adjudicator employed irrelevant facts which revealed an unlawful and discriminatory stereotyping. *See Doe v. Miami University*, 882 F.3d 579, 589 (6th Cir. 2018) (identifying such "archaic assumptions" as a category of Title IX liability). In upbraiding Plaintiff on the question of consent, for example, the Adjudicator stingingly criticized Plaintiff as having seriously violated the School's Sexual Misconduct Policy by "his decision to take someone he did not know at all, essentially a stranger, back to his dorm room to engage in sexual contact . . . ." Fleming Aff., Ex. 1 at 9. First, this was wrong because it characterized it as Plaintiff's "decision," which neglects the record evidence from a third-party witness BM that Jane Doe expressly and affirmatively consented to do so. *Id*. at 2. But, second, it also showed bias in the form of unlawful stereotyping that Plaintiff, as a male, bore a greater responsibility than Jane Doe who, after all, consented to go to a stranger's dorm room too.[5] Such stereotyping constitutes

---

[4]  *See* Jessica Ortiz Linkedin Profile, https://www.linkedin.com/in/jessica-ortiz-03b7016, last accessed Oct. 31, 2019 at 1:15 p.m.; Jessica Ortiz Partner Profile, MoloLamken.com, http://www.mololamken.com/lawyers-jessica-ortiz.html; LawDragon News, *MoloLamken Announces Commitment To ABA Intern Program*, LawDragon.com, Feb. 1, 2018, http://www.lawdragon.com/2018/02/01/mololamken-announces-commitment-aba-judicial-intern-opportunity-program/.

[5]  The statement also betrayed the further stereotype of an oversexual male taking advantage of an unsuspecting female, a stereotype which was precisely false as a matter of objective fact in this case. Here, Plaintiff was the one of the two who had

9

prohibited "archaic assumptions" under Title IX.  *See, e.g., Pederson v. La. State Univ.*, 213 F.3d 858, 881 (5th Cir. 2000) (holding that the existence of paternalistic and stereotypical assumptions to be facially discriminatory, and that "actions resulting from an application of these attitudes constitutes intentional discrimination;" "[w]ell-established Supreme Court precedent demonstrates that [such] archaic assumptions . . . constitute intentional gender discrimination"); *see also Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 402 (W.D.N.Y. 2017) (finding a valid inference of gender bias when, coupled with allegations of public pressure, an accused male was asked questions about the parties' level of inebriation and the accusing female was not asked such questions, since it fed into a prohibited stereotyping of "men as predators and women as guardians of virtue").

Defendant's expressed characterization of the disputes at issue in these cases also reveals a gender bias.  Describing sexual assaults on college campuses as an "alarming" and "very real epidemic" (Def. Mem. at 7), Defendant betrays its buy-in to what is more a gender-based political movement than a data-driven reality.  The idea that such incidents on college campuses are at the level of an epidemic has long been called into serious question.[6]  In 2014, the Department of Justice found that the number of college women victimized by sexual assault is actually 4 out of every 1,000.  *See* U.S. Department of Justice, *Rape and Sexual Assault Victimization Among College-Age Females*, 1995–2013, Dec. 2014,  https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf.  Additionally, the DOJ found that college enrolled women are safer from sexual assault than women who don't enroll in college (*id.*), and statistics

---

just ended a two-year relationship while Jane Doe, then just a freshman, had had admitted to sexual encounters with multiple different male students in that year.

[6]   The claims are based on a federally subsidized study that showed approximately 25% of college women are victims of sexual assault.  *See* Christopher P. Krebs, Christine H. Lindquist, Tara D. Warner, Bonnie S. Fisher, Sandra L. Martin, *The Campus Sexual Assault Study*, Dec. 2007, https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf.  This study, and others like it, has been criticized as based upon too small a sample of campuses (only 2 campuses in the original study) and too reliant on self-selecting samples.  *See, e.g.,* Emily Yoffe, *The Problem With Campus Sexual Assault Surveys*, Slate.com, Sept. 24, 2015, https://slate.com/human-interest/2015/09/aau-campus-sexual-assault-survey-why-such-surveys-dont-paint-an-accurate-portrait-of-life-on-campus.html. Much of the reputable literature on the subject places the maximum number of incidents of sexual assault against college women at 2.14%.  *See* George Will, *Reconsidering the Government's Guidance on Campus Rape Issues*, National Review, Sept. 9, 2018; Alexandra King, CNN, *Campus rape statistics 'misleading,' says author of new book*, Jan. 28, 2017, https://www.cnn.com/2017/01/28/health/campus-rape-book-author-cnntv/index.html, (co-author of book on the subject of sexual assault on campus which found the percent of female victims on college campus is closer to 1 out of 100 or 1 out of 50).

show overall victimization from sexual assault in the public at large has shrunk by 64% since 1995. *See* U.S. Department of Justice, *Female Victims of Sexual Violence*, 1994-2010, Mar. 2013, https://www.bjs.gov/content/pub/pdf/fvsv9410.pdf. Based on this data, much of which is aged and should be known, Defendant's characterization of sexual assault on campus as "alarming" and an "epidemic" is revealing of an insistent gender bias in the face of data to the contrary.

### III. The Balance of Equities Tips Decidedly in Plaintiff's Favor

Lastly, Defendant contends that the balance of equities weigh in favor of denying Plaintiff's motion for preliminary injunctive relief. In doing so, Defendant all but concedes that Plaintiff's claims are colorable, will not be dismissed on motion, and that Plaintiff will have "his day in court in the context of a full hearing on a complete record." Def. Mem. at 25. Yet, a preliminary injunction is needed to preserve the status quo ante so that Plaintiff will not suffer avoidable, permanent harm while waiting for that day in court. As it stands, without such preliminary relief, Plaintiff will very soon have lost this semester, his classes, his planned courses for his major, and his correlate in writing. He will also be indelibly branded with the ignominious mark of being someone who was banished from school for sexual misconduct, and a lifetime of answering questions and explaining the circumstances. *See Doe v. Middlebury College*, 2015 U.S. Dist. LEXIS 124540, at *9. This is a permanent injury which cannot be remedied, even by prevailing on the merits. While Defendant's finding can be expunged, the forced time off can never be expunged.

Defendant counters that the issuance of a preliminary injunction would amount to a "summary annulment" of its hearing results, and that such a result would cause harm to Jane Doe. In truth, neither Vassar nor Jane Doe would be subjected to harm.

The sanction issued by Defendant required that Plaintiff (i) be suspended for a semester, (ii) complete a course in sexual education and health, (iii) grant Jane Doe a "first right of refusal" to shared spaces, and (iv) meet with the Associate Dean of the College, Student Living and Wellness once a month. *See* Def. Mem. at 7. Of the four, it is only the suspension which would cause permanent and irreparable injury, and it is only from the suspension which Plaintiff seeks preliminary relief. The preliminary injunction

to enjoin execution of Plaintiff's suspension and banishment from his studies and campus life would leave in place three of the four sanctions issued. This would not be any sort of annulment. And Vassar will not lose its ability to vindicate its processes after a full and fair trial on the merits.

With respect to the issue of harm to Jane Doe, it bears emphasis that she herself originally recommended a sanction of probation along with a request for accommodations. Fleming Aff., Ex. 1 at 8. The requested probation presupposed that Plaintiff would remain on campus, and the request for accommodations was designed to protect against their inadvertent interactions. The preliminary relief requested on this motion accords fully or near fully with Jane Doe's original sanction recommendation. Accordingly, harm to Jane Doe from its issuance, if any, would be minimal.[7]

For these reasons, we contend the balance of the equities tips overwhelmingly in Plaintiff's favor. On this motion, we simply and respectfully request the issuance of a preliminary injunction merely to preserve the status quo ante pending a trial on the merits to prevent avoidable and permanent harm from being incurred in the interim.[8]

---

[7] Defendant also implies that Plaintiff's requested relief constitutes a mandatory injunction requiring that Defendant take a specific act of restoring him to campus, rather than merely prohibiting it from altering the parties' normal relationship by executing its suspension of him. Yet, courts have recognized that such a distinction is often semantical. *See Jolly v. Coughlin*, 76 F.3d 468, 473-74 (2d Cir. 1996); *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Important to such characterizations is the length of time that the underlying offensive act has been in place and, therefore, how established the practice is that the injunction would undo. *Jolly*, 76 F.3d at 474. Put differently, courts must analyze how established is the thing the movant seeks to enjoin which, here, was only recently established. *See XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp.2d 263, 272 (S.D.N.Y. 2012) (the "status quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which proceeded the pending controversy") (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994)); *see also Bachman v. Harrington*, 184 N.Y. 458, 464 (1906) ("it sometimes happens that the *status quo* is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant . . . [who] presents a case showing or tending to show that affirmative action by the defendant, of a temporary character, is necessary to preserve the status of the parties . . . .")(italics in original)(citation omitted); *accord Second on Second Café v. Hing Sing Trading*, 66 A.D.3d 255, 265 (N.Y. App. Div. 1st Dep't 2009).

[8] Lastly, Defendant attacks the non-Title IX causes of action in Plaintiff's Verified Complaint as being each without merit. As the instant motion concerns Plaintiff's need for preliminary injunctive relief to avoid suffering permanent harm, and Defendant's arguments are directed towards dismissal of these claims without having cross-moved to dismiss, we do not address them here. We will be happy to address such arguments at the appropriate time.

<u>Conclusion</u>

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be granted.

Dated:   New York, New York
         November 1, 2019

                                              GAGE SPENCER & FLEMING LLP


                                              By: <u>  */s/ William B. Fleming*  </u>
                                                    William B. Fleming
                                                    410 Park Avenue, Suite 810
                                                    New York, New York 10022
                                                    Tel. (212) 768-4900
                                                    Wfleming@gagespencer.com
                                                    *Attorneys for Plaintiff John Doe*