UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

John Doe,

                         Plaintiff,

        -against-

Vassar College,

                         Defendant.

OPINION AND ORDER
19-cv-9601 (NSR)

NELSON S. ROMÁN, United States District Judge

Plaintiff John Doe, a senior at Vassar College ("Vassar"), commenced this action against Defendant Vassar on October 17, 2019. (ECF No. 1.) Vassar suspended Plaintiff for one semester after he was found responsible for engaging in nonconsensual sexual activity with a female student. Plaintiff alleges that Vassar's actions deprived Plaintiff of his rights to due process and equal protection on the basis of his sex, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). Plaintiff also asserts state law claims sounding in breach of contract, breach of the covenant of good faith and fair dealing, estoppel and reliance, and negligence, and seeks a declaratory judgment pursuant to 28 U.S.C. § 2201.

Before the Court is Plaintiff's application for a preliminary injunction allowing him to immediately return to school. (ECF Nos. 3, 4.) Vassar opposes the application. (ECF No. 8.) The Court has carefully reviewed the parties' submissions and considered the arguments made by both parties at a show cause hearing held on November 6, 2019, at the United States Courthouse, 300 Quarropas St., White Plains, NY 10601. For the following reasons, Plaintiff's application is DENIED.

# BACKGROUND

## I.       Factual Background[1]

Plaintiff and Jane Doe ("Jane") are students at Vassar.  (Compl. ¶ 1.)  Plaintiff is a senior

and is the captain of Vassar's soccer team.  (Compl. ¶¶ 1, 23.)  On the night of May 4, 2019,

Plaintiff and Jane met at a party off campus.  (*Id.* ¶¶ 11–13; Fleming Decl. Ex. 1 at 2.)[2]  They

danced intimately together and kissed on the dance floor.  (Compl. ¶¶ 14–16; Fleming Decl. Ex.

1 at 2.)  Both were drinking alcohol.  (Fleming Decl. Ex. 1 at 2.)  Eventually, Plaintiff and Jane

left the party together.[3]  (Compl. ¶ 17; Fleming Decl. Ex. 1 at 2.)  They went to Plaintiff's

dormitory room.  (Compl. ¶ 22; Fleming Decl. Ex. 1 at 2–3.)  Plaintiff states that while in his

room, he and Jane engaged in mutual sexual touching until Plaintiff, realizing that Jane was

intoxicated, withdrew from the sexual activity.  (Compl. ¶¶ 24–25; Fleming Decl. Ex. 1 at 4;

Barrett Aff. Ex. 2 at 6.)

In the days after this encounter, Jane filed a formal complaint with Vassar's Title IX

Coordinator, Rachel Pereira, presenting a very different version of events.  (Compl. ¶ 29;

Fleming Decl. Ex. 1 at 4; Barrett Aff. Ex. 1.)  She alleged, *inter alia*, that while in his dorm

room, Plaintiff attempted to coerce her into a sexual encounter and engaged in non-consensual

---

[1] The Court presumes familiarity with the factual background in this case.  The background provided herein includes only those facts relevant to the instant application for injunctive relief.  Unless otherwise indicated, facts have been drawn from the Complaint ("Compl." (ECF No. 1)), the Declaration of William B. Fleming in Support of Plaintiff John Doe's Order to Show Cause ("Fleming Decl." (ECF No. 4)) and attached exhibits, and the Affirmation of Monica C. Barrett in Opposition to Plaintiff John Doe's Order to Show Cause ("Barrett Aff." (ECF No. 8)) and attached exhibits.

[2] Citations to Fleming Decl. Ex. 1, which includes the Post-Title IX Hearing Determination ("Determination") made by the Title IX adjudicator, include references to page numbers based on the original pagination of the Determination, rather than the total number of pages in the exhibit.  The Determination is also annexed to the Barrett Affirmation as Exhibit 4.

[3] Plaintiff and Jane recall the manner in which they left the party differently.  Plaintiff states that Jane led him out of the party.  (Compl. ¶ 17.)  Jane said that Plaintiff grabbed her hand and pulled her out the front door without saying anything to her.  (*See* Fleming Decl. Ex. 1 at 2.)

sexual touching of her lips, breasts, and labia, in violation of the Vassar College Regulations (the "College Regulations"), including Vassar's Sexual Misconduct Policy.  (Compl. ¶ 29; Barrett Aff. Ex. 1.)  Pereira notified Plaintiff of Jane's allegations in writing on May 23, 2019, and advised that an investigation would be conducted.  (Barrett Aff. Ex. 1.)

Following the filing of Jane's complaint, Susan Corrado, outside Title IX investigator, conducted an inquiry with regard to Jane's allegations.  (*See* Barrett Aff. Ex. 2.)  Corrado interviewed Plaintiff, Jane, and several other witnesses, and collected photographs and relevant text messages sent around the time of the incident.  (*Id.*)  She prepared a detailed written report based on her investigation, which Plaintiff and Jane had an opportunity to review prior to an adjudicatory hearing held on September 18, 2019.  (*Id.*; Fleming Decl. Ex. 1 at 1–2; Compl. ¶ 35.)  Plaintiff was notified of the hearing date by Pereira on September 5, 2019, and was advised, in accordance with Vassar's Title IX hearing procedures, that all witnesses he intended to call had to be identified to Pereira by 3 p.m. on September 16, 2019.  (Barrett Aff. Exs. 3, 5.)  Pereira further informed Plaintiff that he would be notified of the names of any witnesses appearing at the hearing.  (*Id.*)

Jessica Ortiz ("Ortiz" or "Adjudicator Ortiz"), an external adjudicator, presided over the Title IX hearing and, after a review of the evidence, including the investigation report and presentations from both Plaintiff and Jane, found Plaintiff responsible for violating Section 5.05A (Sexual Misconduct/Non-Consensual Contact)[4] and 5.04 (Sexual Harassment)[5] of the

---

[4] In relevant part, the College Regulations define non-consensual sexual contact as "[a]ny intentional sexual touching, however slight, with any object, by a person upon a person, that is without consent and/or by force." (Barrett Aff. Ex 5 at 33.)  The College Regulations require affirmative consent to sexual contact.  (*Id.* at 36.) Affirmative consent "can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.  Silence or lack of resistance, in and of itself, does not demonstrate consent."  (*Id.*)

[5] In relevant part, the College Regulations define sexual harassment as "unwelcome conduct which is either of a sexual nature, or which is directed at an individual because of that individual's sex that has the purpose or effect

College Regulations by a preponderance of the evidence.  (Fleming Decl. Ex. 1.)  In reaching her determination, Ortiz credited Jane's account that she explicitly told Plaintiff multiple times on the way back to his dorm room that she did not want to "hook up."  (*Id.* at 5–7.)  Ortiz emphasized that Jane vividly recalled this fact, even when questioned repeatedly by Ortiz; that "Jake," a witness at the hearing for Jane, stated that when Jane called him from Plaintiff's room the night of the incident asking Jake to pick her up, she said she had told Plaintiff she did not want to "hook up"; and that numerous text messages Jane sent hours after waking up later in the morning on May 5, 2019, telling others she did not want to "hook up," corroborated Jane's statements.  (*Id.*; *see* Barrett Aff. Ex. 2, exhibits A–H.)  Ortiz "gave considerable weight" to the text message statements, which described not only Jane's affirmative statement of non-consent, but also corroborated Jane's version of what happened after she arrived at Plaintiff's dorm room. (Fleming Decl. Ex. 1 at 6; *see* Barrett Aff. Ex. 2, exhibits A–H.)  She also stated that Jake's testimony, which described conversations he had with Jane the night of the incident, when he went to Plaintiff's dorm room to pick Jane up, and the day after the incident, was "of particular note."  (Fleming Decl. Ex. 1 at 7.)  Ortiz found Jake to be "a credible witness" without any bias or motive to fabricate or exaggerate the facts.  (*Id.*)  Ortiz noted that Jake and Jane allegedly had a previous sexual relationship that ended without conflict prior to the incident with Plaintiff and took it as an indication of Jake's credibility that Jake was open and honest about his history with Jane.  (Fleming Decl. Ex. 1 at 7.)

---

of unreasonably interfering with an individual's employment or educational performance … Harassment needs only to rise above the threshold of petty slights or trivial inconveniences … The college's policy on sexual misconduct may also apply when sexual harassment involves physical contact."  (Barrett Aff. Ex. 5 at 19.)  Sexual harassment includes "egregious, unwanted sexual attention or other verbal or physical conduct of a physical nature."  (*Id.*)

Ortiz also concluded, based on the evidence before her, which included Jane's statements, witness statements, and photographs, that it was more likely than not that Jane was very intoxicated at the time of the incident.  (*Id.* at 5.)  Indeed, Ortiz noted that Plaintiff himself stated that he stopped touching Jane while in his dorm room because she was drunk, "which further supports the finding that she likely could not have provided consent at that point."[6]  (*Id.* at 6.)  Further, opining that "there is no proof that [Jane] consented to the sexual contact that took place [in Plaintiff's dorm room]," Ortiz concluded that the contact met the definition of "sexual contact" requiring consent under Section 5.05A of the College Regulations[7] and the definition of "sexual harassment" under Section 5.04 of the College Regulations.[8]  (*Id.*)

Ortiz recommended that Plaintiff's sanction be suspension and educational intervention. (*Id.* at 9.)  In accordance with that recommendation, Vassar issued the following sanctions to Plaintiff: (1) suspension from Vassar for one semester (Fall 2019); (2) educational intervention, requiring Plaintiff to complete a course or program and/or enroll in ongoing counseling that addresses sex, intimacy, healthy dating relationships, consent, and appropriate sexual communication and interaction; (3) upon Plaintiff's return to Vassar, Jane was to have the right of first refusal to shared spaces; and (4) upon his return to Vassar, Plaintiff was to meet with the Associate Dean of Vassar once a month until the conclusion of the semester.  (Barrett Aff. Ex. 6.)

Although Jane, like Plaintiff, was required to submit the names of all of her witnesses by 3 p.m. two business days before the hearing, Jane did not inform Pereira in writing that Jake

---

[6] The College Regulations state that "[c]onsent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity."  (Barrett Aff. Ex. 5 at 36.)

[7] *See infra* note 4.

[8] *See infra* note 5.

would be appearing as a witness for her until 8 p.m. on September 16, 2019, approximately five hours after the deadline.  (Compl. ¶ 47.)  Plaintiff was informed that Jake would be a witness on September 17, 2019, at 8:14 p.m., the evening before the hearing.  (*Id.* ¶ 49.)  After the conclusion of the hearing and the imposition of Plaintiff's sanction, Jake sent a text message to Plaintiff expressing sympathy for Plaintiff and regret for his participation in the hearing. (Fleming Decl. Ex. 3.)  Jake stated that he felt responsible for Plaintiff's punishment, that Plaintiff didn't deserve it, and that he felt like he testified "prematurely."  (*Id.*)  In another writing prepared by Jake on September 28, 2019, Jake described Plaintiff's sanctions as "an extreme and unfair punishment" and maligns Jane as "manipulative," "toxic," and "a person who knows what she wants and does everything in her power to get it."  (*Id.* Ex. 4.)  He also says that his testimony was "based off one side of the story, the complainant."  (*Id.*)

On September 29, 2019, Plaintiff appealed Ortiz's decision to the College Regulations Appeal Committee (the "Appeal Committee") based on the alleged "new evidence" about Jake, his lack of notice that Jake would be testifying, and the severity of the punishment given. (Compl. ¶¶ 56–57; Barrett Aff. Ex. 7.)  On October 3, 2019, the Dean of Vassar, Carlos Alamo-Pastrana, denied Plaintiff leave to appeal on the grounds asserted except with regard to Plaintiff's allegation of procedural error, which he sent to the Appeal Committee.[9]  (Compl. ¶ 59; Barrett Aff. Ex. 10.)  On October 14, 2019, the Appeal Committee affirmed Ortiz's decision and recommended punishment.  (Compl. ¶ 60; Barrett Aff. Exs. 13–14.)  The Appeal Committee found that late notice of Jake's participation as a live witness did not impact the outcome of the

---

[9] Plaintiff asserts that Dean Alamo-Pastrana "characterized the sanction imposed of suspension as possibly disproportionate relative to the alleged conduct."  (Compl. ¶ 58.)  More accurately, Dean Alamo-Pastrana denied Plaintiff's appeal on the grounds that his sanction was disproportionate because while Plaintiff provided "compelling information related to the possibility of a disproportionate sanction relative to the severity of the violations," it failed to establish that Plaintiff's sanction of suspension was substantially outside the parameters set by Vassar, which provided a sanction range between probation *up to* expulsion based on Plaintiff's violations. (Barrett Aff. Ex. 10.)

hearing because, among other things, e-mail correspondence between Jane and Vassar's Title IX office indicated that Jane had provided verbal notice of her request to have Jake as a witness at the hearing as early as the week of September 9, 2019, and Plaintiff had the opportunity to ask Jake questions at the hearing and the right to take breaks during the hearing to prepare questions. (Barrett Aff. Exs. 13–14.)  The Appeal Committee highlighted that the College Regulations did not specify how notice of witnesses was to take place, and that although they required such notice be provided to the Title IX office two days before a hearing, they permitted the parties to the hearing to be notified of witnesses at any time thereafter.  (*Id.*)

## II.      Procedural Background

Plaintiff's order to show cause for a preliminary injunction enjoining Vassar from enforcing its sanction of suspension against Plaintiff and preventing Plaintiff from being on campus and participating fully in all student activities was signed by Judge Briccetti on October 17, 2019.  (ECF No. 3.)  Plaintiff originally also sought a temporary restraining order ("TRO") lifting his suspension so that he could play in a soccer game.  (*Id.*)  Judge Briccetti denied Plaintiff's application for a TRO, finding that a TRO was not warranted because, *inter alia*, the punishment imposed by Vassar was suspension for one semester which, "on the record before the Court at this time, would not appear to prevent plaintiff from obtaining a college degree or playing professional soccer and therefore does not appear to constitute irreparable harm."  (*Id.*)  Judge Bricetti noted that Plaintiff's application for a preliminary injunction remained pending.  (*Id.*)  A show cause hearing on the issue of the preliminary injunction, at which all parties were in attendance, was held before this Court on November 6, 2019.

## LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (alteration in original) (emphasis in original) (internal quotation marks omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consolidated Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)). "A decision to grant or deny a preliminary injunction is committed to the discretion of the district court." *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) (citation omitted).

In this Circuit, a party seeking a preliminary injunction must demonstrate that it will suffer irreparable harm absent injunctive relief and either "(1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (internal citations omitted)). When a party seeks a mandatory, as opposed to a prohibitory, injunction, however, that party is required to meet a heightened legal standard by showing "a clear or substantial likelihood of success on the merits." *North Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018) (quotation marks omitted) (citation omitted).

Since "the proposed injunction's effect on the status quo drives the standard, [the court's first step is to] ascertain the status quo—that is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120

(2d Cir. 2014) (quoting *La-Rouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994)) (footnote omitted). In the parlance of a preliminary injunction, "[t]he 'status quo' ... is really a 'status quo ante.'" *Id.* at 37 n.5 (citations omitted). The Second Circuit has explained that "[t]his special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *Id.*

In the instant case, it appears that the status quo ante was the moment before Plaintiff's suspension was imposed. *See Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (referring to "preserv[ing] the status quo" as permitting suspended students to continue attending school in the context of a temporary restraining order and preliminary injunction). Thus, the Court operates under the assumption that Plaintiff seeks a prohibitory injunction, and, provided he establishes irreparable harm, may make a showing of either a probability of success on the merits or a serious question going to the merits plus the balance of hardships tipping decidedly in his favor.

## DISCUSSION

Plaintiff claims that he will suffer irreparable harm if he is not permitted to attend classes and play soccer at Vassar for the remainder of the Fall 2019 semester, and that he is likely to succeed on the merits of his Title IX discrimination claim because Adjudicator Ortiz's finding that he engaged in sexual misconduct and sexual harassment was erroneous and motivated by bias in favor of women and against men. Plaintiff further argues that even if the Court finds he is not likely to succeed on the merits, he raises serious questions going to the merits of his Title IX claim and the balance of hardships decidedly favors him. For the reasons given below, the Court

disagrees with each of the foregoing claims and finds that Plaintiff has not demonstrated entitlement to a preliminary injunction.

## I.      Irreparable Harm

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (citation omitted) (internal quotation marks omitted). "To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). Thus, where money damages could adequately compensate a plaintiff's alleged harm, a preliminary injunction will not issue. *See Jackson Dairy, Inc.*, 596 F.3d at 72.

Plaintiff avers that he will suffer irreparable harm if the Court does not order Vassar to lift his suspension because, if the suspension is continued, he "will forever lose his ability to play college soccer and will be forced, next Fall, to decide whether to return to school to obtain a degree and forfeit an opportunity to play soccer professionally,[10] or elect to pursue his professional soccer ambitions and lose the ability to obtain a college degree for the foreseeable future and all the opportunities which accompany having obtained a degree." (Plaintiff's Memorandum of Law in Support of Plaintiff's Order to Show Cause ("Pl. Mem.") (ECF No. 4) 12.) Put differently, Plaintiff complains that while he is not losing a professional soccer opportunity as a result of his suspension and would be able to complete his degree immediately

---

[10] At the show cause hearing, Plaintiff elaborated upon his soccer opportunity and revealed that he does not have a written contract to play for any team overseas. Plaintiff stated that the situation was "complicated." Thus, the nature of Plaintiff's professional opportunity is not entirely clear to the Court at this juncture.

following his suspension, he is harmed because he may not be able to do both in the time frame

he had anticipated and desired.  Plaintiff also states that he will "incur irreparable losses of

professional and educational opportunities as well as once in a lifetime memories."  (*Id.* 1.)

Finally, Plaintiff states that he will lose his "perfect behavioral record and now bear the false

mark of being a sex offender."  (*Id.* 2.)

As to Plaintiff's alleged professional soccer opportunity, the Court can discern no

connection between Plaintiff's continued pursuit of his soccer career and his suspension.  There

have been no allegations that the opportunity will be revoked as a consequence of Plaintiff's

suspension, or that Plaintiff must complete his degree as a prerequisite to playing soccer

overseas.  *See Doe v. Middlebury Coll.*, No. 1:15-cv-192, 2015 WL 5488109, at *3 (D. Vt. Sept.

16, 2016) (plaintiff who had a job offer to begin immediately after his graduation contingent on

his successful completion of his degree at Middlebury College demonstrated irreparable harm).

Indeed, it appears that there is nothing stopping Plaintiff from pursuing any and all of his sports-

related ambitions.

Moreover, the Court concludes on the record before it that the harm that Plaintiff will

suffer from suspension for a single semester at beginning of his senior year is not irreparable.  As

the Second Circuit has held, the harms a plaintiff might suffer from a delay in graduation are

quantifiable and can be adequately remedied by money damages, should the plaintiff prevail on

the merits of his case.  *See Phillips v. Marsh*, 687 F.2d 620 (2d Cir. 1982) (West Point cadet

failed to show irreparable harm as required to obtain a preliminary injunction requiring the

United States Military Academy at West Point to graduate and commission her, because any

damages which would accrue to her from deferring her career as a military officer would be

compensable by money damages).  Whether an interruption in coursework is irreparable harm is

a closer question, which the Second Circuit has not squarely addressed, and on which it appears that district courts have disagreed. *Compare Montague v. Yale Univ.*, No. 3:16-cv-00885, 2017 WL 4942772, at *4 (D. Conn. March 8, 2017) (college basketball player who was found to have violated Yale's sexual misconduct policy and was expelled as a consequence did not allege irreparable harm from delay in completing his education, not graduating with his contemporaries, and the possibility of decreased employment opportunities); *Silman v. Utica Coll.*, No. 6:14-CV-0432, 2015 WL 365670, at *2 n.2 (N.D.N.Y. Jan. 27, 2015) (plaintiff who was expelled mid-semester did not establish irreparable harm from interruption in coursework where he could complete his courses at another accredited university); *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio. 2015) ("[C]ourts have also held that a suspension from school is not irreparable.") (citing *Medlock v. Trs. Of Ind. Univ.*, No. 1:11-cv-00977, 2011 WL4068453, at *9 (S.D. Ind. Sept. 13, 2011)); *Mahmood v. Nat'l Bd. of Med. Examiners*, No. 12-cv-1544, 2012 WL 2368462, at *5 (E.D. Penn. June 21, 2012) (three-year suspension from medical school did not constitute irreparable harm); *with Doe v. Middlebury*, 2015 WL 5488109, at *3 (plaintiff expelled prior to staring senior year would suffer irreparable harm because he would lose, *inter alia*, a particular employment opportunity to begin following graduation and would have to explain for the remainder of his professional life why his education either ceased prior to completion or contains a gap); *Bhandari v. Tr. of Columbia Univ.*, No. 00-cv-1735, 2000 WL 310344, at *5 (S.D.N.Y. March 27, 2000) (requiring plaintiff to repeat the courses he was already taking after serving his suspension would "forever deny him the benefit of the work he has already performed and would necessarily delay his ultimate fulfillment of the requirements for a degree"); *Doe v. Penn. State Univ.*, 276 F. Supp. 3d 300, 314 (M.D. Penn. 2017)

(suspension that could last up to six years, and at minimum would last two years, constituted irreparable harm).

Here, Plaintiff's specific claim is that, absent a preliminary injunction, he will lose the ability to play college soccer as well as his ability to graduate with his class this year.  Plaintiff does not explore or explain why he could not obtain the credits required for graduation at another accredited university or take additional courses with Vassar over school breaks to ensure that he obtains his degree on time.  At the show cause hearing, Vassar indicated that it was open to discussing such alternatives.  Plaintiff states that if he misses this semester, he will lose an English seminar class that would count towards a "correlate" in writing, which Plaintiff has not yet declared.[11]  (Pl. Mem. 13.)  However, even if this is understood as an assertion that Plaintiff would have to re-take courses, he would not establish irreparable harm because "[t]here are no lack of colleges or universities [h]e might attend if all that is at stake is loss of instruction time." *Phillips*, 687 F.2d at 624 (Winter, J., concurring).

Plaintiff also claims that as a result of the suspension, he will be labeled a sex offender, because he will forever have to explain the circumstances behind his suspension to future employers or graduate schools.  As Vassar has pointed out, the record of Plaintiff's suspension is protected from disclosure without his consent by the Family Educational Rights and Privacy Act ("FERPA"), (*see* Defendant's Memorandum of Law in Opposition to Plaintiff's Order to Show Cause ("Def. Mem.") (ECF No. 8) 25.).  *See Medlock*, 2011 WL 4068453, at *9 (noting, in finding that plaintiff did not establish irreparable harm, that plaintiff's suspension "will not be permanently noted on his academic transcript" since the record of suspension is maintained in a

---

[11] Plaintiff also says that this is the last semester that he will be allowed to declare or change his major, "an option he will lose if suspended."  (Pl. Mem. 13.)  However, Plaintiff has provided no indication that he intends to change his major.

confidential file protected by the FERPA and obtainable only with plaintiff's consent). In addition, the mere fact that Plaintiff might have to explain a gap in his studies does not automatically result in a finding of irreparable harm. Any delay in graduation might be subject to inquiry, but such delay does not always constitute irreparable harm. *See Phillips*, 687 F.2d at 622 ("We can conceive of no irreparable harm that would accrue to [plaintiff] in allowing her graduation to await the outcome of the trial on the merits."); *Mahmood*, 2012 WL 2368462, at *5 (noting that "delays in testing or education services do not constitute irreparable harm") (citing cases). Further, Plaintiff's broad assertion that he will be harmed by having to explain his suspension to employers or graduate schools is too speculative to warrant injunctive relief, since he has identified no plans to attend any graduate school or pursue any specific career besides professional soccer, and Plaintiff does not claim that his potential employers in that area have any interest in his completion of a college degree, let alone his suspension for one semester.

If Plaintiff is denied injunctive relief at this early stage in the proceedings, the primary, serious, and non-speculative harm he will suffer is the delay of a single semester in his education and graduation. Such a delay, under the circumstances presented in this case, does not constitute harm that would not be compensable by money damages. Because Plaintiff has not demonstrated that he would be irreparably harmed absent the issuance of a preliminary injunction, his application must be denied. Moreover, as discussed below, even if Plaintiff had met his initial burden by showing irreparable harm, he has not demonstrated either a likelihood of success on the merits or a serious question going to the merits of his Title IX claim and would not be entitled to injunctive relief on that separate basis.

## II.      Likelihood of Success or Serious Question Going to the Merits

To establish a likelihood of success on the merits, a plaintiff must show that he is more

likely than not to prevail on his claims, or, in other words, that the "probability of prevailing is 'better than fifty percent.'"  *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

However, even if a plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may still be granted if the plaintiff shows "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor."  *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (internal quotations omitted).  This alternative "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  *Citigroup Global Mkts., Inc.*, 598 F.3d at 35.  "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, *Jackson Dairy, Inc.*, 596 F.2d at 72 (emphasis added), its overall burden is no lighter than the one it bears under the 'likelihood of success' standard."  *Citigroup Glob. Markets, Inc.*, 598 F.3d at 35.

Here, the crux of Plaintiff's case is that Vassar's treatment of him in connection with Jane's complaint violated Title IX.[12]  "In the context of university discipline, the Second Circuit has recognized two categories of Title IX claims: (1) claims of an erroneous outcome from a

---

[12] Plaintiff also includes several state law claims (i.e., breach of contract, breach of good faith and fair dealing, estoppel and reliance, and negligence) in his Complaint, but does not seriously address any of them in the instant application.  Plaintiff includes only the conclusory statement that "Defendant's failure to follow its own rules, standards, and/or procedures also violated its implied contract with Plaintiff and his reasonable expectation that Defendant's rules would be honored, applied fairly and consistently to protect him from just such an unfair and harmful result."  (Pl. Mem. 17.)  As the Court discusses herein, Plaintiff's submissions do not reflect that any rules, standards, or procedures were violated by Vassar.  Thus, Plaintiff does not show a likelihood of success on the merits or a serious question going to the merits of his state law claims.

flawed proceeding, and (2) claims of selective enforcement." *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015). In pleading an erroneous outcome under Title IX, as Plaintiff seeks to do, a party asserts that he or she was innocent and wrongly found to have committed the offense he or she was charged with. *Id.* To state an erroneous outcome claim, the plaintiff must allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and that "gender bias was a motivating factor" behind the erroneous outcome. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

Importantly, it is not within the purview of a district court to second-guess a university's credibility determinations and overall evaluation of the evidence. *See Yu*, 97 F. Supp. 3d at 462. Rather, where a plaintiff takes issue with a university's credibility determinations, "the Court's role is to consider whether these determinations were motivated by gender bias." *Id.* at 477. A finding that another party's version of events is more credible than plaintiff's, without more, does not demonstrate gender bias. *See Doe v. Colgate Univ.*, 760 Fed. App'x 22, 33 (2d Cir. 2019).

Plaintiff raises a number of challenges to the allegedly defective process employed by Vassar in conducting his disciplinary hearing. Most notably, Plaintiff asserts that Vassar violated its own procedural rules by allowing Jane to identify Jake as a witness five hours after the applicable deadline. (*See* Pl. Mem. 8, 15.) As the Appeal Committee noted, however, the College Regulations do not specify the manner in which parties are required to give notice of their witnesses to Vassar, and Jane's e-mail correspondence indicated that she had orally identified Jake well before the deadline. (Barrett Aff. Exs. 13, 14.) In addition, while Plaintiff takes issue with the fact that he was not notified that Jake would be testifying until around 8 p.m. the evening before the hearing, (Pl. Mem. 8, 15), there is no provision in the College Regulations

requiring greater notice than that, nor was it alleged that Jane would have been given more advanced notice if Plaintiff had decided to call any witnesses.

Moreover, Plaintiff does not allege that he was denied the opportunity to cross-examine Jake, that he was not permitted breaks during the hearing to prepare further questions, or that there was any specific line of questioning he would have pursued if he had an extra day to prepare for the cross-examination.  To be sure, in an affidavit submitted with Vassar's opposition, Pereira states that during a one-hour lunch recess in the middle of the hearing, Plaintiff was asked if he needed more time to prepare, given that Jake was to testify next, and that Plaintiff said, "no, he was ready."  (Affidavit of Rachel Pereira ("Pereira Aff.") (ECF No. 8) ¶ 6.)  Instead, Plaintiff claims that if he had known about Jake's testifying sooner, he could have reached out to Jake before the hearing to "probe him and the veracity of what he would say" and might have "stopped him from providing the untrue and prejudicial testimony with which he persuaded the Adjudicator."  (Pl. Mem. 8, 15.)  Apparently, Plaintiff believes that he should have been entitled to attempt to influence a witness's testimony, and potentially convince that witness not to testify, prior to his Title IX hearing.  This Court does not share that belief, nor does Plaintiff cite to any legal authority supporting such a proposition.

Plaintiff complains of a plethora of other procedural issues, including that he was not allowed to cross-examine Jane, that he was denied counsel, and that Vassar declined to adopt a higher standard of proof than a preponderance of the evidence.  (Pl. Mem. 15, 16; Plaintiff's Reply Memorandum of Law in Further Support of Plaintiff's Order to Show Cause ("Pl. Reply") (ECF No. 15) 6.)  Plaintiff cites no case within this Circuit to support his arguments that any of the foregoing constitute procedural defects in a Title IX proceeding, and the Court declines to adopt any such rules.  Further, Pereira's sworn statement calls into question some of Plaintiff's

allegations that he was denied due process on account of his gender.  For instance, Pereira states

that special accommodations were made so that Plaintiff could participate in the hearing via

telephone even after he insisted on leaving in the middle of it to take a team soccer picture and

play a soccer game, (Pereira Aff. ¶¶ 2–4), that Plaintiff was told he could stop the proceedings at

any time to take a break, meet with his support person, or prepare, (*id.* ¶ 5), that Pereira met with

Plaintiff each time he requested an additional meeting to ask questions and review the

investigatory report, (*id.* ¶ 9), and that after Plaintiff shared with her that his father was an

attorney, Pereira offered twice to allow Plaintiff's father to review the investigatory report with

him prior to the hearing, and to make accommodations to do this telephonically if it would make

things easier for the family, but Plaintiff refused, (*id.* ¶ 10).

It does not appear that Plaintiff either is likely to prevail on the merits or raises a serious

question going to the merits of his Title IX claim with respect to the due process issues he raises.

Plaintiff admitted as much at the show cause hearing, agreeing with the Court that the procedural

issues don't have much "bite" to them.  Instead, Plaintiff's challenge to the results of his

disciplinary proceeding is driven largely by his assertion that Adjudicator Ortiz's credibility

determinations and factual findings were flawed and biased.  As Vassar states, "Plaintiff's attack

on the findings boils down to his belief that the complainant should not have been believed."

(Def. Mem. 13.)  In his briefing and at the show cause hearing, Plaintiff has argued that crediting

Jane's account of non-consent was both an error sufficient to raise an articulable doubt as to the

outcome of the Title IX proceeding and indicative of gender bias.

At the Title IX hearing, Plaintiff and Jane told different stories.  Plaintiff said that Jane

kissed him at a party and then led him outside.  (Barrett Aff. Ex. 2 at 5–6.)  He said that when he

suggested they go to his dorm, she willingly went with him to his room.  (*Id.* at 6.)  He said that

once on the bed in his room, he kissed Jane and touched her intimately over her clothes.  (*Id.*)
He said that he felt Jane was able to consent to this encounter because while he was touching her,
he said words to the effect of "is this okay?" and she said yes.  (*Id.*)  He said he decided to end
the encounter because Jane was drunk, but that she never lost consciousness or appeared to be
sleeping.  (*Id.*)

Jane said that she and Plaintiff kissed at the party and that Plaintiff led her outside.  (*Id.* at
2.)  She said that they ran into a friend of hers, "Benji," on the way out, and that when Benji
asked Jane if she was okay to go with Plaintiff, she said yes, because in her mind, she was going
home.  (*Id.*)  She said that she was intoxicated and needed assistance to walk.  (*Id.*)  She said that
on the walk back to their dorms, she told Plaintiff, distinctly, "I don't want to hook up, I'm too
drunk – I want to go back to Lathrop.  I can't consent."  (*Id.* at 3.)  She said that Plaintiff told her
they would just "chill" in his dorm.  (*Id.*)  When they arrived at his dorm room, she said that
Plaintiff laid her on his bed and touched her breasts and genitals.  (*Id.*)  She said that she gave no
verbal consent to any sexual act, and that her body froze, "kind of like a fight or flight response,"
and she pretended to be asleep until, a few moments later, Plaintiff stopped.  (*Id.*)

Plaintiff and Jane had the opportunity to ask questions of each other, and Ortiz had the
opportunity to ask them questions.  (Fleming Decl. Ex. 1 at 5.)  Ortiz listened to their answers
closely, and, where necessary, asked follow-up questions to clarify the answers.  (*Id.*)  She also
observed each party and, where necessary, provided them time to prepare an answer to her
question and consult with their support person.  (*Id.*)  She "carefully considered the credibility of
each party."  (*Id.*)  Ortiz also weighed other evidence presented during the hearing to determine
what happened after Plaintiff and Jane left the party.  This evidence included photographs of
Jane over the course of the night in which Jane appeared to be more intoxicated as the night

progressed;[13] text messages that Jane sent to several witnesses later in the day on May 5, 2019, corroborating Jane's version of events; Jake's testimony at the hearing corroborating Jane's account of non-consent based on conversations he had with Jane on May 5, 2019; and statements from Benji and other students to whom Jane had sent text messages. (*Id.* at 5–7.)

Ortiz made a rational decision, based on the evidence before her, to believe that Jane affirmatively said no to engaging in sexual activity with Plaintiff on the walk to his dorm. Plaintiff now asks the Court to find that Ortiz was wrong to make that decision, to discredit Jane, and to give credence to his version of events. As the Court has emphasized, however, a credibility determination made by a university adjudicator cannot be disturbed absent flawed processes and gender bias. *See Yu*, 97 F. Supp. 3d at 477–78. Plaintiff's attempts to demonstrate that there is a serious question as to the presences of either of these elements fall flat.

For instance, Plaintiff says that it was clear error for Ortiz to believe Jane because Jane "expressly acknowledged her consent to a third person" when she told her friend, Benji, that she was okay to leave the party with Plaintiff. (Pl. Mem. 3.) In a nutshell, Plaintiff's argument is that because a third-party thought Jane was planning to hook up with Plaintiff, Jane must have consented to what happened in Plaintiff's room. As a preliminary matter, Plaintiff's suggestion that a third-party must offer more probative evidence of implicit consent than the person giving that consent is problematic. Moreover, as Ortiz observed in making her decision, Jane's consent to leave the party with Plaintiff, and even to return to his dorm room with him, does not equate to consent to participate in any sexual activity upon their arrival there. (Fleming Decl. Ex. 1 at 7; *see* Barrett Aff. Ex. 5 at 36.) Most significantly, Ortiz made a concrete determination that, after leaving the party, after talking to Benji, and after agreeing to go with Plaintiff to his dorm room,

---

[13] The conclusion Ortiz drew based on the photographs was corroborated by witnesses who said Jane appeared more intoxicated in the photographs taken later in the night. (Fleming Decl. Ex. 1 at 5.)

Jane said no to engaging in sexual activity with Plaintiff.  (*Id.* at 5.)  Specifically, Jane said that

she did not want to hook up and that she was too drunk to consent.  (Barrett Aff. Ex. 2 at 3.)

Ortiz credited Jane's account on this point, which Plaintiff disputed, after carefully considering

all of the evidence before her.  (Fleming Decl. Ex. 1 at 5–7.)  That she determined Jane to be

more credible than Plaintiff is not indicative of unfairness or bias towards Plaintiff.  *See Doe v.

Colgate*, 760 Fed. App'x at 33.

Similarly, under the circumstances presented, it was not improper for Ortiz to credit

Jane's account of what happened in his room over Plaintiff's account.  That Jane said she could

not remember whether she initially responded to Plaintiff's kiss in his dorm room, (*see* Barrett

Aff. Ex. 2 at 3), does not alter this conclusion.  Ortiz was not obligated to conclude that since

Jane could not remember whether she kissed Plaintiff back, Jane necessarily kissed him back.  In

addition, even if Ortiz had concluded that Jane kissed Plaintiff in his room, under the College

Regulations kissing does not necessarily amount to consent to any of the other sexual acts that

followed.  (*See* Barrett Ex. 5 at 36 ("Consent to any sexual act or prior consensual activity

between or with any party does not necessarily constitute consent to any other sexual act.").)

Failing to establish a likelihood of success on the merits or a serious question going to the

merits of his Title IX claim on the basis of Ortiz's giving credence to Jane, Plaintiff next

suggests that it was improper for Ortiz not to allow questions about Jane's "relevant" sexual

history of "targeting for sex soccer players," and not to consider Plaintiff's past participation in

campus training on sexual harassment and sexual misconduct, which Plaintiff says led to his

"exemplary exhibition" of adherence with Vassar's rules governing sexual conduct by

"extricating himself from the sexual activity at Jane's first exhibition of intoxication to a level

possibly negating consent."  (Pl. Mem. 4.)  As to the first suggestion, Jane's alleged sexual

history with students on the soccer team has absolutely no bearing on whether she consented to engage in sexual activities with Plaintiff.  Whether a victim had one or more prior sexual encounters is not grounds for a presumption of consent.  Plaintiff's argument to the contrary endorses a dangerous stereotype that is completely devoid of logic.  As to Plaintiff's second assertion that his participation in trainings on sexual harassment and misconduct should have been taken into account, again, the Court can discern no impact this would have had on the ultimate question of whether Jane consented or was more or less credible than Plaintiff.

The Court concludes that Plaintiff has not established a likelihood of success on the merits or raised a serious question going to the merits of his Title IX claim on the basis of Ortiz's conduct at the Title IX hearing.  It appears at this juncture that ample evidence was presented at the hearing to support findings that Jane did not consent to sexual activity in Plaintiff's dorm room, that she may have become intoxicated to the point of incapacitation while she was with Plaintiff, and that she communicated that possibility to Plaintiff prior to arriving at his dorm room in no uncertain terms when she said she was too drunk to consent to "hooking up."  That Adjudicator Ortiz accepted this evidence and found Jane more credible than Plaintiff does not indicate that she engaged in conduct that was unfair to Plaintiff, or that she was improperly biased against Plaintiff.  Rather, it appears that Ortiz behaved in a manner consistent with her responsibility to weigh the evidence before her in an impartial manner and make factual determinations according to the standards set forth by the College Regulations.  Therefore, it would not be within the Court's purview to interfere with Ortiz's decision.  *See Doe v. Colgate Univ.*, No. 5:15-CV-1069, 2017 WL 4990629, at *23 (N.D.N.Y. Oct. 31, 2017) ("The Court cannot engage in a granular examination of the record to find fault in the Panel's decision-making.");  *Yu*, 97 F. Supp. 2d at 461 ("The Court's role . . . is neither to advocate for the best

practices or policies nor to retry disciplinary proceedings."); *Walker v. President and Fellows of Harvard Coll.*, 82 F. Supp. 3d 524, 531 (D. Mass. 2014) ("It is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject." (quotations omitted) (citation omitted)).

In addition to his claims that Ortiz "stretched" to find Jane credible, Plaintiff argues that the Appeal Committee's decision to uphold Ortiz's findings was flawed because it did not sufficiently account for Jake's "recantation."  The Court has carefully reviewed the communications Plaintiff received from Jake following his hearing.  Plaintiff's characterization of these communications as a recantation is misleading.  In his text message and letter, Jake, after learning that Plaintiff has been suspended from Vassar, expresses regret for his role in the hearing.  (Fleming Decl. Exs. 3-4.)  He says that Jane did not ask for Plaintiff to be suspended and that he feels he is responsible.  (*Id.*)  He says that after hearing other testimony in the proceeding, he has decided that he no longer believes Jane's version of events, as related to him the night of the incident and the following day, though he also says he does not believe anyone is intentionally lying.  (*Id.* Ex. 4.)  Jake calls Jane "manipulative," and says that he doesn't speak to her anymore.  (*Id.*)  He concludes that "the current punishment, which was caused partly by [his] testimony of which [he is] not confident in anymore, is much too severe."  (*Id.*)  Absent from Jake's communications, however, is any indication that his testimony was false.  Contrary to Plaintiff's assertions, that Jake feels sympathy for Plaintiff and thinks he is a "good person with a huge heart" who shouldn't have been punished so severely, (*id.*), is not equivalent to a recantation of his testimony as to the substance of various conversations he had with Jane around the time of and immediately following the incident.  Nor does the fact that Jake no longer believes Jane's account alter the accuracy of that testimony.  Plaintiff has not demonstrated that

it was likely an error for the Appeal Committee to uphold Ortiz's findings as based in part on Jake's corroboration of Jane's account, nor has he raised serious questions as to propriety of the Appeal Committee's determination.

In a final effort to establish a likelihood of success on the merits or serious questions going to the merits of his Title IX claim, Plaintiff introduces the theory that Vassar was pervaded by gender bias in the context of campus sexual assault discourse.  Plaintiff bases this theory on Vassar's provision to students of "extensive training on sexual assault and violence prevention which inculcates the idea that, to provide appropriate support to claimed victims and to encourage reporting of claims, victims are to be believed regardless of the facts."  (Compl. ¶ 31.) Plaintiff states that Vassar began administering these trainings in response to public criticism following an incident about five years ago where a student on the soccer team was found not responsible for sexual misconduct after a Title IX hearing.  (Compl. ¶ 33; Pl. Mem. 15–16.)

With respect to Title IX erroneous outcome claims in the context of campus sexual assault proceedings, the Second Circuit has held that a plaintiff may plausibly allege discriminatory intent by pointing to a university's alleged motivation to favor accusing female students over accused male students due to criticism from the student body and public media that the university failed to protect female students from sexual assault.  *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).  In the case before the Second Circuit, Columbia University moved to dismiss the Title IX discrimination claim of a male plaintiff who was suspended as a result of a disciplinary investigation and hearing arising from allegations that the plaintiff sexually assaulted another student.  *Id.* at 49–53.  In deciding that the plaintiff's claim could go forward, the Second Circuit highlighted the plaintiff's allegations that the investigator and the hearing panel involved failed to act in accordance with school procedures designed to protect accused

24

students and declined to even explore the testimony of the plaintiff's proposed witnesses.  *Id.* at 56–57.

As a preliminary matter, the Court notes that *Doe v. Columbia* applied Title IX jurisprudence under the liberal pleading standards applicable to Title IX claims on a motion to dismiss.  *Id.* at 53.  There is no indication that the plaintiff's ability to meet that minimal standard indicates that he presents a serious question on the merits for the purposes of demonstrating entitlement to a preliminary injunction.  Moreover, the facts on the record in the instant case are distinguishable from those in *Doe v. Columbia*.  For example, while the investigator responsible for looking into the allegations against the plaintiff in *Doe v. Columbia* personally faced public criticism for "inadequate investigations," *id.* at 51, no such connection is made here between Ortiz or Corrado and the criticism allegedly directed at Vassar.  In addition, the public criticism alleged in *Doe v. Columbia* preceded the plaintiff's disciplinary investigation by a matter of months; here, five years have passed since the events Plaintiff cites.  It is also unclear that Plaintiff adequately pleads a connection between Vassar's alleged bias in favor of victims of sexual assault on one hand, and gender bias on the other.  The only link between victimhood and gender that Plaintiff provides is the statement that "[m]ost of the reporting students are women and most of the responding students, or the accused students, are men," (Compl. ¶ 72).  *See Doe v. Coll. of Wooster*, 243 F. Supp. 3d, 875, 886–87 (N.D. Ohio 2017) (gender neutral public criticism of university's handling of sexual assault "may supply a possible motive for favoring assault victims" but did not "suggest a basis for discrimination against male students"); *Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017) (plaintiff's allegations that accused students were primarily male, and that university was under Department of Education investigation into its handling of sexual assaults, said "nothing about the University's alleged

desire to find men responsible because they are men"), *see also Columbia*, 831 F.3d at 57

(observing that plaintiff alleged public criticism of the university not taking seriously complaints

of *female* students alleging sexual assault by *male* students).

Most significantly, Plaintiff's arguments that Vassar failed to follow its own procedures

or otherwise engaged in conduct unfair to Plaintiff find no support in the record before the Court,

even in the documents submitted by Plaintiff.  This factor alone may foreclose Plaintiff's Title

IX discrimination claim.  *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019)

(summarizing *Doe v. Columbia* as standing for the general principle that where a university "(1)

takes an adverse action against a student or employee, (2) in response to allegations of sexual

misconduct, (3) *following a clearly irregular investigative or adjudicative process*, (4) amid

criticism for reacting inadequately to allegations of sexual misconduct by members of one sex,

these circumstances provide the requisite support for a *prima facie* case of sex discrimination"

(emphasis added)).

For all of the foregoing reasons,[14] Plaintiff fails to demonstrate a serious question going

to the merits of his claim, and certainly does not establish that he is likely to succeed on the

merits.  Accordingly, Plaintiff is not entitled to the preliminary injunction he seeks.

## CONCLUSION

In light of the foregoing, Plaintiff's application for a preliminary injunction is DENIED.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 4.  This

---

[14] Plaintiff also argues that the Title IX proceedings were tainted by gender bias because Plaintiff was the only man at the hearing, that Ortiz and the investigators were women, and that Ortiz was a member of such organizations as "ABA Women Rainmakers," and "The Professional Women's Business Network," and led her law firm's diversity program to help underrepresented minorities, including women, attain judicial clerkships.  These arguments are patently meritless.  A Title IX plaintiff does not demonstrate a serious question as to the presence of gender bias merely by pointing out that a decisionmaker's biological sex was the opposite of his own, or that the decisionmaker participated in professional organizations aimed towards empowering women in a particular industry.

constitutes the Opinion and Order of the Court.


Dated:    November 21, 2019                    SO ORDERED:
          White Plains, New York


                                          _____
                                               NELSON S. ROMÁN
                                          United States District Judge